**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 15-cv-24440-COOKE/TORRES**

| | |
|---|---|
| NGHIEM TRAN, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>              v.<br><br>ERBA DIAGNOSTICS, INC., SURESH VAZIRANI, KEVIN D. CLARK, SANJIV SURI, MOHAN GOPALKRISHNAN, ARLENE RODRIGUEZ, PRAKASH PATEL, ERBA DIAGNOSTICS MANNHEIM GMbH, TRANSASIA BIO MEDICALS LTD., and MAYER HOFFMAN MCCANN P.C.<br><br>              Defendants. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Nghiem Tran ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Complaint against Defendants ERBA Diagnostics, Inc., ("ERBA") Suresh Vazirani, Kevin D. Clark, Sanjiv Suri, Mohan Gopalkrishnan, Arlene Rodriguez, Prakash Patel, ERBA Diagnostics Mannheim GMbH ("Erba (Germany)"), Transasia Bio Medicals Ltd. ("Transasia"), and Mayer Hoffman McCann, P.C. ("MHM") ("Defendants"), alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's investigation included (a) review of ERBA's SEC filings; (b) review of public information and analyst reports concerning ERBA; and (c) discussions with former ERBA employees. Information concerning Defendants' fraud is peculiarly within Defendants' control, as it consists of ERBA's internal business affairs. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and certain others set out in ¶159 below who purchased the securities of ERBA between June 14, 2013 and November 20, 2015 (the "Class Period"), inclusive, seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Through its subsidiaries, ERBA develops, manufactures, and markets products used in medical diagnoses. Throughout the Class Period, ERBA was indirectly about 81% owned by Transasia. Transasia's Managing Director, Suresh Vazirani, also serves as ERBA's CEO and Managing Director.

3.      SEC rules required ERBA to disclose in its 10-Ks whether it had liquidity difficulties, including whether it was generally able to pay its bills on time. ERBA did not disclose any such difficulties. Indeed, in each of its 2012, 2013, and 2014 10-Ks, ERBA claimed that its cash was ample to meet its needs and that it had not been affected by any prior cash flow problems.

4.      This was far from the truth. In fact, ERBA was perpetually short on cash. Even back in February 2013, ERBA would routinely push off its vendors' bills for up to six months, in violation of contractual terms. ERBA kept so little cash in its accounts that it was reduced to check kiting by moving cash into business accounts just in time to cover checks that were about to be cashed.

5.      Beyond slow-paying and non-paying vendors, ERBA's cash problems also forced it to take decisions that were bound to damage it. For example, in November 2013, ERBA was forced to lay off many of the employees of a newly-acquired subsidiary – regardless of whether

these employees were skillful or essential. As a result, that subsidiary's production ground to a halt.

6.     ERBA's non-payment and slow-payment of vendors began to seriously damage its business in mid-to-late 2014 as ERBA's vendors cut it off. ERBA was forced to place many of its products on back-order. Entire lines of ERBA's products became impossible to buy. ERBA was forced to switch to sub-par vendors. An ERBA sales representative recounts that he was forced to try to sell ERBA's test kits to hospitals even though for certain parts used in the kits, ERBA had to switch to a vendor whose parts were not FDA-approved. The sales representative's job was thus to sell products to customers who could not lawfully use them. As a result, ERBA sold less products to its customers, and lost customers altogether – causing a decrease in its reported revenue. According to ERBA's head of sales & marketing, ERBA lost millions of dollars of customer orders as a result.  Further, because ERBA could not supply its customers with test kits, they had to hire third-party labs to run other companies' tests instead. ERBA had to promise its customers it would reimburse them for the costs they thereby incurred – at a cost of up to $1.5 million.

7.     Thus, the 10-Ks were misleading for omitting to disclose ERBA's significant cash flow deficiencies.

8.     Laws and regulations generally applicable to public companies required ERBA to maintain adequate internal controls over financial reporting. These rules also forced ERBA to disclose all material deficiencies in internal controls.

9.     ERBA conceded that its internal controls had a material deficiency – but claimed that it was caused by a lack of qualified personnel. ERBA did not disclose a much more alarming deficiency: it did not make contemporaneous records of its financial transactions, meaning that it

had to reconstruct its financial transactions months or years later from bank records.  Of course it is impossible to create adequate financial records in such a manner.

10.     Not surprisingly, according to the ERBA accountant whose job it was to reconstruct the accounting records, the accounts still didn't balance.  Accordingly, on a daily basis, ERBA's controller, Defendant Rodriguez, instructed the employee to create fraudulent accounting entries to cause the accounts to balance – without any backup showing that the purported transactions ever actually occurred. The employee refused ERBA's request that she sign off on the finished accounting records, for which she was fired by Defendant Gopalkrishnan. She also told ERBA's auditor, Defendant MHM, that the accounting records were not true and accurate, yet the auditor nonetheless issued investors an audit report certifying that the financial statements created with these untrue and inaccurate financial records were presented in accordance with Generally Accepted Accounting Principles ("GAAP").

11.     Thus, ERBA's 10-Ks were misleading for failing to disclose as a material weakness in internal controls that ERBA did not make contemporaneous records and that the accountant whose job it was to compile the accounting records claimed they were not accurate. Further, Defendant MHM's audit report was misleading for failing to disclose that the very accountant whose job it was to reconstruct ERBA's accounting records had told it that the accounting records were not truthful.

### *Loss causation*

12.     The problems resulting from ERBA's undisclosed cash shortage and heavy customer losses in late 2014 and early 2015 caused its financial results to come in well below expectations and well below the previous year's results. On November 10, 2014, before the start of trading, ERBA announced its results for Q3 2014, revealing that its revenues were down almost

$0.5 million from Q3 2013 and fell well below analyst expectations. That day, ERBA's stock price $3.12/share to close at $2.74/share, or 12.2%.

13.     On May 15, 2015, after close of trading, ERBA announced its results for Q4 2014, revealing that its revenues were down almost $1.7 million from its results in Q4 2013, and making a surprise loss of $295,000, against a net profit of $706,000 in Q4 2013. The next trading day, ERBA's stock price fell from its previous close of $3.05/share to close at $2.71/share, or 11.1%.

14.     On June 26, 2015, after close of trading, ERBA announced its results for Q1 2015. The results were dismal: Q1 2015 revenues were a mere $4.9 million, down almost 25% from the previous year's total, and ERBA recorded a surprise net loss of more than $1.0 million. On June 29, the next trading day, ERBA's stock price fell from its previous closing price of $2.90/share to close at $2.18/share, down 24.8%.

15.     Meanwhile, ERBA's fraudulent accounting was causing persistent difficulties in completing its financial statements. On April 21, 2015, ERBA disclosed that it had received a letter from the NYSE stating that the NYSE believed that ERBA's latest filing delay was a material violation of its listing agreement, for which the NYSE was authorized to suspend and eventually remove ERBA's stock from trading. Over the next two trading days, ERBA's stock price fell from $3.34/share to $2.82/share, a total loss of 15.5%.

16.     Then, on November 20, 2015, after close of trading, ERBA announced that its financial statements could no longer be relied upon because they contained material misstatements. ERBA disclosed that it had overstated its 2013-2014 net income by $3.0-4.0 million. On the next trading day, ERBA's stock price fell from its previous close of $0.30/share to close at $1.44 per share, or 17.2%, further damaging investors.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company conducts business in this district and maintains its headquarters in this district.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.     __PARTIES__

21.     Plaintiff, as set forth in his certification previously filed on this Court's docket and incorporated by reference, purchased ERBA common stock at artificially inflated prices during the Class Period and has been damaged thereby.

22.     Defendant ERBA is a Delaware Corporation headquartered at 14100 NW 57th Court, Miami Lakes, Florida 33014. ERBA develops, manufactures, and markets diagnostic test kits or assays, and automated systems that are used to aid in the detection of disease markers primarily in the areas of autoimmune, infectious diseases, clinical chemistry, hematology, and diabetes testing. During the Class Period, the Company's stock was traded on the NYSE under the symbol "ERB."

23.     Defendant Suresh Vazirani served as ERBA's Executive Chairman of its Board of Directors since September 2010. Vazirani is also CEO and Managing Director of ERBA (Germany), and Chairman and Managing Director of Transasia. Vazirani founded Transasia.

24.     Defendant Kevin D. Clark was ERBA's President and CEO from September 2010 to July 31, 2013, Clark served as ERBA's COO since September 2007, and COO of ImmunoVision Inc., a company acquired by ERBA's predecessor, since 1987.

25.     Defendant Sanjiv Suri was the Company's Interim CEO from August 1, 2013 until his resignation effective June 1, 2014.

26.     Defendant Mohan Gopalkrishnan has been the Company's CEO since June 1, 2014. Prior to his appointment, Gopalkrishnan served as ERBA's Vice-President – Operations since October 2012.

27.     Defendant Arlene Rodriguez, CPA, was ERBA's Principal Financial Officer, Principal Accounting Officer, and Controller, from February 2012 until June 2013. Rodriguez previously served as Director of Accounting of Continucare Corporation, then a public company, from 2010 through February 2012. Rodriguez's responsibilities included ensuring that Continucare's financial statements were presented in accordance with GAAP.

28.     Defendant Prakash Patel was the Company's Principal Financial Officer, Principal Accounting Officer, and Controller from June 2013 until his resignation, effective April 30, 2015. Prior to his appointment, Patel had six years' experience as a corporate controller.

29.     Defendant ERBA Diagnostics Mannheim GMbH ("ERBA (Germany)") is ERBA's controlling shareholder, holding about 81% of its shares throughout the Class Period. ERBA (Germany)'s Managing Director, Vazirani, is also ERBA's Executive Chairman.

30.     Defendant Transasia Bio Medicals Ltd. ("Transasia") is ERBA (Germany)'s parent. Transasia's Managing Director, Vazirani, is also ERBA's Executive Chairman.

31.     Defendants Transasia and ERBA (Germany) are the "Corporate Controlling Defendants."

32.     Defendants Vazirani, Clark, Suri, Gopalkrishnan, Rodriguez, and Patel are collectively referred to herein as the "Individual Defendants."

33.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

34.     ERBA is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

35.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to ERBA under *respondeat superior* and agency principles.

36.     Defendant ERBA, the Controlling Corporate Defendants, and the Individual Defendants are collectively referred to hereinafter as the "ERBA Defendants."

37.     Defendant Mayer Hoffman McCann P.C. ("MHM") was appointed as ERBA's registered independent auditor on May 15, 2012, and remains in this position to this day. MHM issued false and misleading audit reports attesting to the accuracy of ERBA's financial statements on June 14, 2013, April 14, 2014 and May 15, 2015 which were included ERBA's annual reports filed with the SEC.

38.     The ERBA Defendants and Defendant MHM are the "Defendants".

   A. **Former employees**[1]

39.     Former Employee 1 ("FE 1") was an Accounting Manager at ERBA from February 2013 until around September 2013. FE 1 was hired to reconstruct ERBA's financial records to allow it to create financial statements. FE 1's daily responsibilities included assisting the outside auditors with their analysis of ERBA's financial statements, inputting accounting journal entries, balancing ERBA's subsidiaries' various bank accounts, and assisting with wire transfers and payroll. She also assisted with "getting [JAS's] financials presentable."[2]

40.     Between February 2013 and June 2013, FE 1 reported to Defendant Rodriguez, ERBA's controller. Beginning July 2013, FE 1 reported directly to Defendant Patel, who was then its controller.

---

[1] This Complaint omits the former employees' names to protect their privacy. The employees' names will be provided to the Court and Defendants upon request.
[2] JAS Diagnostics, Inc. is and was a subsidiary of ERBA, as discussed below.

41.     FE 2 was a Vice President of Sales & Marketing at ERBA from June 2014 to May 2015. FE 2 was the overall head of ERBA's sales & marketing department. 37 ERBA employees, or about a quarter of all company employees, reported to him. He reported directly to Defendant Gopalkrishnan. FE 2 and his team were based out of Miami and Fort Lauderdale, and managed ERBA's hematology sales in the U.S. and Latin America.

42.     FE 3 was ERBA's Southeast Regional Sales Manager from October 2013 to January 2015. His sales territory was Florida, Georgia, Alabama, Mississippi, North Carolina, and South Carolina. He initially reported to FE 5 and then, after FE 5 left in February 2014, to Defendant Gopalkrishnan. During his tenure, FE 3 was one of only five ERBA salespeople for its entire US territory.

43.     FE 4 had a twenty-year career as a scientist at Drew Scientific and its predecessors, reaching the position of Senior Technology Specialist in hematology research. In January 2014, Gopalkrishnan abruptly told him he would be reassigned as a Sales Representative. He had no experience in sales and received no training from ERBA. His territory was the Eastern Seaboard States from Maine to Maryland.  FE 4 continued in this position until January 2015.

44.     FE 5 was a Vice President of Sales at Escalon beginning in 2004, and continued with ERBA after it acquired portions of Escalon in November 2012. He remained at ERBA until February 2014. He reported directly to ERBA's CEOs – first, Kevin Clark, and later, Gopalkrishnan.

## IV.   Background
### A.  Transasia acquires a controlling stake in ERBA.

45.     ERBA conducts business through several wholly owned subsidiaries, including Delta Biologicals, S.r.l. ("Delta"); Diamedix Corporation ("Diamedix); ImmunoVision, Inc. ("ImmunoVision"); Erba Diagnostics Mexico S.A. ("ERBA (Mexico)"); and Drew Scientific, Inc.

("Drew Scientific") and JAS Diagnostics, Inc. ("JAS"), both of which were acquired in October 2012 from Escalon Medical Corp. ("Escalon").

46.     On September 1, 2010, ERBA Diagnostics Mannheim GMbH ("ERBA (Germany)") acquired a 72.4% interest in ERBA from its then-controlling shareholder for an aggregate purchase price of $15.0 million, or $0.75 per share.

47.     Then, on June 30, 2011, ERBA (Germany) purchased 20,000,000 ERBA shares from ERBA for $15.0 million, or $0.75 per share pursuant to a Stock Purchase Agreement, which also awarded ERBA (Germany) warrants to purchase an additional 20 million shares of ERBA stock at a price of $0.75 per share; through December 31, 2013, ERBA (Germany) exercised warrants to purchase 600,000 shares. As a result, as of December 31, 2013, ERBA (Germany) held 82.4% of ERBA's shares.

48.     ERBA (Germany) is a wholly-owned subsidiary of Transasia Bio-Medicals Ltd. ("Transasia"), a company organized under the laws of India. Transasia is reportedly the largest in-vitro diagnostics company in India.

49.     Transasia also holds several other subsidiaries, including Erba Diagnostics France SARL ("ERBA (France)"), Erba Rus ("Erba (Russia)"), Erba Lachema ("Erba (Czech)"), and Erba DDS ("Erba (Turkey)").

50.     ERBA specializes in the manufacture and marketing of proprietary diagnostic reagents, test kits and instrumentation in the areas of autoimmune, chemistry, hematology, diabetes and infectious diseases.

## V.     Defendant's Misconduct

**A.  ERBA had an obligation to disclose liquidity trends and deficiencies, specifically its dire cash shortage, and also had an obligation to disclose information necessary to make other statements made not misleading.**

51.     Item 303(a) of SEC Regulation S-K required ERBA to disclose in all its 10-Ks and

10-Qs all known liquidity trends and deficiencies and capital resources. Item 303 states in relevant

part:

> (1) Liquidity. Identify any known trends or any known demands, commitments,
> events or uncertainties that will result in or that are reasonably likely to result
> in the registrant's liquidity increasing or decreasing in any material way. *If a*
> *material deficiency is identified, indicate the course of action that the*
> *registrant has taken or proposes to take to remedy the deficiency. Also identify*
> *and separately describe internal and external sources of liquidity, and briefly*
> *discuss any material unused sources of liquid assets.*

Regulation S-K Item 303(a) [17 C.F.R. § 229.303(a)] (emphasis added).

52.     The SEC's instructions to Item 303 provide:

> 2. The purpose of the discussion and analysis shall be to provide to investors and
> other users information relevant to an assessment of the financial condition and
> results of operations of the *registrant as determined by evaluating the amounts*
> *and certainty of cash flows from operations and from outside sources*.
> []
> 5. The term 'liquidity' as used in this Item refers to the ability of an enterprise to
> generate adequate amounts of cash to meet the enterprise's needs for cash. Except
> where it is otherwise clear from the discussion, the registrant shall indicate those
> balance sheet conditions or income or cash flow items which the registrant believes
> may be indicators of its liquidity condition. *Liquidity generally shall be discussed*
> *on both a long-term and short-term basis.*

(Emphasis added).

53.     The SEC further explained that when a company is aware of a material deficiency

in its liquidity it should disclose both the deficiency and proposed remedy, if any:

> Where a material deficiency in short or long-term liquidity has been identified,
> *the registrant should disclose the deficiency, as well as disclosing either its*
> *proposed remedy, that it has not decided on a remedy, or that it is currently*
> *unable to address the deficiency*. [footnote omitted]. In the following example,
> a financially troubled registrant d i s c u s s e s  the material effects of its cash flow
> problems on its business, and its efforts to remedy those problems.

*Managements Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co.*
*Disclosures*, Release No. 6835 (May 18, 1989) (emphasis added).

54.     In the example of necessary disclosure the SEC provides, the company discloses:

> The Company frequently has not been able to make timely payments to its trade
> and other creditors. As of year-end and as of February 29, 1988, the Company
> had past due payables in the amount of $525,000 and $705,000, respectively.

Deferred payment terms have been negotiated with most of these vendors. However, certain vendors have suspended parts deliveries to the Company. As a result, the Company was not always able to make all shipments on time, although no orders have been cancelled to date. Were significant volumes of orders to be cancelled, the Company's ability to continue to operate would be jeopardized. The Company is currently seeking sources of working capital financing sufficient to fund delinquent balances and meet ongoing trade obligations.

*Id.*

55.     Regulation S-K applies to, among other things, annual reports on Form 10-K, and all items required to be filed under SEC rules, including quarterly financial reports on forms 10-Q. Regulation S-K Item 10(a)(1)-(2) [17 C.F.R. § 229.10(a)(1)-(2)].[3]

**B. The Exchange Act and internal control standards required ERBA to keep contemporaneous records of transactions.**

56.     The Exchange Act requires issuers like ERBA to keep books and records setting out transactions it engages in. Further, an issuer's system of internal controls requires that transactions be recorded as necessary to both prepare financial statements and compare transactions with assets at reasonable intervals. The Exchange Act's relevant provisions are:

**(2)** Every issuer which has a class of securities registered pursuant to section 78*l* of this title and every issuer which is required to file reports pursuant to section 78*o*(d) of this title shall--
    **(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
    **(B)** devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
    **[…]**

        **(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; [and]
        […]

---

[3] While SEC rules permit companies to omit such information from 10-Qs if there has been no material change, ERBA's 10-Ks themselves did not disclose its liquidity deficiencies. Accordingly, even had ERBA only discovered its cash flow deficiencies as 2014 progressed, it would still have been required to disclose them in its 10-Qs.

> **(iv)** the recorded accountability for assets is compared with the
> existing assets at reasonable intervals and appropriate action is
> taken with respect to any differences […]

15 U.S.C. § 78m(b)(2)(b).

57.     A good system of internal controls helps management achieve its objectives related

to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and

compliance with applicable laws and regulations. It is management's responsibility to develop and

implement internal controls necessary to ensure that it maintains adequate books and records. This

is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring

Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework

(the "COSO Report").[4]

58.     The COSO Report defines internal control as a process that is "designed to provide

reasonable assurance regarding the achievement of objectives" related to the effectiveness and

efficiency of operations, the reliability of financial reporting, and compliance with applicable laws

and regulations. More broadly, however, a system of internal control encompasses more than the

policies governing the objectives related to operations, financial reporting, and compliance;

namely, it includes the actions taken by a company's board of directors, management at all levels,

and employees in running the business.

59.     The COSO Report requires that financial statements prepared for external purposes

be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from

generally accepted auditing standards, the COSO Report defines fair presentation as the following:

---

[4] Generally accepted auditing standards codified in AU §319, Consideration of Internal Control in
a Financial Statement Audit, is based on the internal control framework described in the COSO
Report. The COSO report was issued in September 1992 as a four-volume set. An Addendum to
Reporting to External Parties was issued in May 1994.

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[5]

60.    The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

61.    As part of both COSO and the Exchange Act, maintaining adequate internal controls includes maintaining books and records setting out contemporaneous records of the transactions ERBA engaged in.

62.    SEC rules require management to evaluate internal controls and disclose *every* material weakness they are aware of. *In Re Mgmt.'s Report on Internal Control over Fin. Reporting & Certification of Disclosure in Exch. Act Periodic Reports*, Release No. 8238, 2003 WL 21294970, at *11 (June 5, 2003)

---

[5] *See* COSO Report, Chapter 3; see also Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

63.     The SEC defines a material weakness as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[6]

### C. Defendants' false statements

64.     The Class Period begins on June 14, 2013, when ERBA filed its 10-K for the year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K was signed by Defendants Vazirani, Clark, Rodriguez, and Suri.

65.     Pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX"), Defendants Clark and Rodriguez each separately certified that:

1.  I have reviewed this annual report on Form 10-K of ERBA Diagnostics, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

66.     The 2012 10-K omitted to disclose that ERBA had liquidity and capital resource problems, and misled investors by stating:

a.  "Our business is not materially affected by order backlog or working capital issues."

---

[6] The Public Company Accounting Oversight Board's ("PCAOB") definition is identical, except is replaces the word "registrant's" with "company's" and notes that "[t]here is a reasonable possibility of an event, as used in this standard, when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ('FAS 5')."  AS 5 ¶A7.

       b. "Our financial condition remains strong with significant cash [and] overall significant working capital."

67.    In fact, as set out in ¶¶103-106 below, ERBA did not have enough cash to pay its obligations as they came due.

68.    The 2012 10-K also downplayed ERBA's significant internal control deficiencies. Specifically, the 2012 10-K disclosed that ERBA had a material weakness in internal controls – that it lacked qualified personnel. The 2012 10-K, however, was misleading for omitting to disclose the much more serious internal control problem that as set out in ¶¶126-138, below, ERBA had not maintained and was not maintaining contemporaneous records of financial transactions and, as such, was forced to create and back-date false financial entries to present to its auditors. Finally, ERBA claimed that its management had concluded that ERBA's financial statements were presented in accordance with GAAP in all material respects. ERBA's statement was misleading for omitting to disclose that (1) because ERBA did not maintain contemporaneous records of financial transactions, there was no reasonable assurance, indeed no reasonable basis to believe, that its financial statements were accurate, and (2) ERBA had requested that FE 1 sign off on its accounting records, but she had refused. The 2012 10-K's statements were:

> ***Notwithstanding the material weakness described below, our management, including our principal executive officer and principal financial officer, has concluded that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.***
> **Management's Report on Internal Control over Financial Reporting**
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material affect on our financial statements.

As of the end of the period covered by this Annual Report on Form 10-K, our management evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our internal control over financial reporting. This evaluation was conducted using the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. As permitted by the applicable rules and regulations of the Securities and Exchange Commission, our management's evaluation of and conclusion on the effectiveness of our internal control over financial reporting did not include the internal control over financial reporting of the businesses commonly known as Drew Scientific and JAS Diagnostics, which we acquired on October 3, 2012 and which, collectively, at December 31, 2012 constituted assets of $9.0 million and represented 36.7% of our consolidated total assets and which, collectively, for the year ended December 31, 2012 generated $3.4 million of net revenues and represented 17.5% of our consolidated net revenues. Based upon that evaluation, our management concluded that our internal control over financial reporting was not effective as of December 31, 2012, because there was a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Specifically, through that evaluation, our management identified a material weakness in our internal control over financial reporting as a result of our inadequate staffing of our financial accounting office, which has resulted in, among other things, at times us being unable to provide timely account reconciliations. Our remediation efforts to address this material weakness are ongoing and include, among other things, hiring additional qualified personnel and evaluating or undertaking certain improvements to our systems and processes, which, if successful, we believe will be sufficient to provide us with the ability to remediate or cure this material weakness in the future. If this material weakness is not remediated or cured, then this deficiency in internal control over financial reporting could adversely affect the timing and accuracy of our financial reporting.

(Emphasis added)

69.     The 2012 10-K also included a certification from Defendant MHM that (1) ERBA's financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP"), and (2) MHM's audit comported with standards enacted by the Public Company Accounting Oversight Board ("PCAOB Standards"):

**Report of Independent Registered Public Accounting Firm**
To the Board of Directors and Shareholders
ERBA Diagnostics, Inc.
We have audited the accompanying consolidated balance sheet of ERBA Diagnostics, Inc. (a Delaware corporation) and its subsidiaries (collectively, the "Company") as of December 31, 2012, and the related consolidated statements of operations and comprehensive loss, shareholders' equity, and cash flows for the year then ended. The Company's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.
***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.
***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of ERBA Diagnostics, Inc. and its subsidiaries as of December 31, 2012, and the results of their operations and their cash flows for the year then ended in conformity with U.S. generally accepted accounting principles.***
/s/ Mayer Hoffman McCann P.C.

Miami, Florida
June 14, 2013

(Emphasis added)

70.      MHM's statements were misleading for omitting to disclose that as set out in ¶¶126-138 below, there was significant doubt, indeed no reasonable basis to state, that ERBA's financial statements were accurate because (1) FE 1, an ERBA accountant who had been asked to sign off on ERBA's accounting records had refused to do so, and had told MHM that the accounting records she herself prepared were not truthful; (2) ERBA's audit was continuing at the time of MHM's opinion, and that it was thus premature to express an opinion; (3) because ERBA did not make contemporaneous financial entries or otherwise keep contemporaneous financial records of transactions, there was no reasonable assurance that its financial statements were accurate. Further, MHM's statement that it conducted its audit in accordance with PCAOB Standards was misleading because, as set out in ¶¶139-145, in response to FE 1's claim that ERBA had created fraudulent accounting records, MHM was required to investigate, determine whether it could rely on management's representations, and report the finding to the audit committee – yet it did none of those things.

71.      On April 14, 2014, ERBA filed its 10-K for the year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Vazirani, Suri, and Patel. The 2013 10-K included ERBA's financial statements for the years ended December 31 2012 and 2013.

72.      Pursuant to the SOX, Defendants Suri and Patel each separately certified that:

1.  I have reviewed this annual report on Form 10-K of ERBA Diagnostics, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

73.     The 2013 10-K omitted to disclose that ERBA had liquidity and capital resource problems, and misled investors by stating:

      a.   "Our business is not materially affected by order backlog or working capital issues."

      b.   "Our financial condition remains strong with significant cash [and] overall significant working capital."

74.     In fact, as set out in ¶¶103-125 below, ERBA did not have enough cash to pay its obligations as they came due.

75.     The 2013 10-K also downplayed ERBA's significant internal control deficiencies. Specifically, the 2013 10-K disclosed that ERBA had a material weakness in internal controls – that it lacked qualified personnel. The 2013 10-K, however, was misleading for omitting to disclose the much more serious problem that ERBA had not maintained and was not maintaining contemporaneous records of financial transactions and, as such, was forced to create and back-date false financial entries to present to its auditors. Finally, ERBA claimed that its management had concluded that ERBA's financial statements were presented in accordance with GAAP in all material respects. ERBA's statement was misleading for omitting to disclose that (1) because ERBA did not maintain contemporaneous records of financial transactions, there was no reasonable assurance, indeed no reasonable basis to believe, that its financial statements were accurate, and (2) ERBA had requested that FE 1 sign off on its accounting records, but she had refused. The 2013 10-K's statements were:

> ***Notwithstanding the material weakness described below, our management, including our principal executive officer and principal financial officer, has concluded that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.***

[]
As of the end of the period covered by this Annual Report on Form 10-K, our management evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our internal control over financial reporting. This evaluation was conducted using the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that evaluation, our management concluded that our internal control over financial reporting was not effective as of December 31, 2013, because there was a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Specifically, through that evaluation, our management identified a material weakness in our internal control over financial reporting as a result of our inadequate staffing of our financial accounting office, which has resulted in, among other things, at times us being unable to provide timely account reconciliations. Our remediation efforts to address this material weakness are ongoing and include, among other things, hiring additional qualified personnel and evaluating or undertaking certain improvements to our systems and processes, which, if successful, we believe will be sufficient to provide us with the ability to remediate or cure this material weakness in the future. If this material weakness is not remediated or cured, then this deficiency in internal control over financial reporting could adversely affect the timing and accuracy of our financial reporting.
(Emphasis added)

76.     The 2013 10-K also reported that ERBA's net income for the year ended December 31, 2013 was $675,828. For the reasons set out in ¶155 below, the 2013 10-K overstated ERBA's 2013 net income. The total overstatement of net income in the period January 1, 2013 and June 30, 2015 is at least $3.0 million-$4.0 million.

77.     The 2013 10-K also included a certification from Defendant MHM that (1) ERBA's financial statements were presented in accordance with GAAP, and (2) MHM's audit comported with PCAOB Standards:

**Report of Independent Registered Public Accounting Firm**
To the Board of Directors and Shareholders
ERBA Diagnostics, Inc.

We have audited the accompanying consolidated balance sheets of ERBA Diagnostics, Inc. (a Delaware corporation) and its subsidiaries (collectively, the "Company") as of December 31, 2013 and 2012, and the related consolidated statements of operations and comprehensive loss, shareholders' equity, and cash flows for the years then ended. The Company's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of ERBA Diagnostics, Inc. and its subsidiaries as of December 31, 2013 and 2012, and the results of its operations and its cash flows for each for the years in the two year period ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America.***

/s/ Mayer Hoffman McCann P.C.

Miami, Florida
April 14, 2014


(Emphasis added)

78.     MHM's statements were misleading for omitting to disclose that there was

significant doubt about, indeed no reasonable basis to believe in, the accuracy of ERBA's financial

statements because (1) as to the 2012 financials, an ERBA accountant who had been asked to sign

ERBA's 2012 financial records had refused to do so and had told MHM that the accounting records

she herself prepared were not truthful; and (2) as ERBA did not make contemporaneous financial

entries, there was no reasonable assurance that its financial statements were accurate. Further, MHM's statement that it conducted its audit in accordance with PCAOB Standards was misleading because in response to FE 1's claim that ERBA had created fraudulent accounting records, MHM was required to investigate, determine whether it could rely on management's representations, and report the finding to the audit committee – yet it did none of those things.

79. On May 15, 2014, ERBA filed its 10-Q for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). Defendant Patel signed the Q1 2014 10-Q.

80. Pursuant to the SOX, Defendants Suri and Patel each separately certified that:

1. I have reviewed this quarterly report on Form 10-Q of ERBA Diagnostics, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

81. The Q1 2014 10-Q did not disclose that ERBA's cash flow was insufficient to pay its obligations as they came due.

82. On August 12, 2014, ERBA filed its 10-Q for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). Defendant Patel signed the Q2 2014 10-Q.

83. Pursuant to the SOX, Defendants Gopalkrishnan and Patel each separately certified that:

1. I have reviewed this quarterly report on Form 10-Q of ERBA Diagnostics, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

84. The Q2 2014 10-Q did not disclose that ERBA's cash flow was insufficient to pay its obligations as they came due.

85.     On November 10, 2014, ERBA filed its 10-Q for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). Defendant Patel signed the Q3 2014 10-Q.

86.     Pursuant to the SOX, Defendants Gopalkrishnan and Patel each separately certified that:

1.    I have reviewed this quarterly report on Form 10-Q of ERBA Diagnostics, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

87.     The Q3 2014 10-Q did not disclose that ERBA's cash flow was insufficient to pay its obligations as they came due.

88.     On May 15, 2015, ERBA filed its 10-K for the year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Vazirani and Gopalkrishnan.

89.     Pursuant to the SOX, Defendant Gopalkrishnan separately certified that:

1.    I have reviewed this annual report on Form 10-K of ERBA Diagnostics, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

90.     The 2014 10-K omitted to disclose that ERBA had liquidity and capital resource problems, and misled investors by stating:

a.    "While our business was not materially affected by working capital issues, our business was materially affected in the fourth quarter of 2014 by order backlog and the consolidation of our Diamedix and JAS manufacturing facilities."

b.    "Our financial condition remains strong with significant cash [and] overall significant working capital."

91.     In fact, as set out in ¶¶107-125 below, ERBA did not have enough cash to pay its obligations as they came due.

92.     The 2014 10-K also downplayed ERBA's significant internal control deficiencies. Specifically, the 2014 10-K disclosed that ERBA had a material weakness in internal controls – that it lacked qualified personnel. The 2014 10-K, however, was misleading for omitting to disclose the much more serious problem that ERBA had not maintained and was not maintaining contemporaneous records of financial transactions and, as such, was forced to create and back-date false financial entries to present to its auditors. Finally, ERBA claimed that its management had concluded that ERBA's financial statements were presented in accordance with GAAP in all material respects. ERBA's statement was misleading for omitting to disclose that (1) because ERBA did not maintain contemporaneous records of financial transactions, there was no reasonable assurance, indeed no reasonable basis to believe, that its financial statements were accurate, and (2) ERBA had requested that FE 1 sign off on its financial statements, but she had refused. The 2014 10-K's statements were:

> ***Notwithstanding the material weakness described below, our management, including our principal executive officer and principal financial officer, has concluded that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.***
> []
>
> As of the end of the period covered by this Annual Report on Form 10-K, our management evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our internal control over financial reporting. This evaluation was conducted using the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that evaluation, our management concluded that our internal control over financial reporting was not effective as of December 31, 2014, because there was a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that

26

there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Specifically, through that evaluation, our management identified a material weakness in our internal control over financial reporting as a result of our inadequate staffing of our financial accounting office, which has resulted in, among other things, at times us being unable to provide timely account reconciliations. Our remediation efforts to address this material weakness are ongoing and include, among other things, hiring additional qualified personnel and evaluating or undertaking certain improvements to our systems and processes, which, if successful, we believe will be sufficient to provide us with the ability to remediate or cure this material weakness in the future. If this material weakness is not remediated or cured, then this deficiency in internal control over financial reporting could adversely affect the timing and accuracy of our financial reporting.

This Annual Report on Form 10-K does not include an attestation report of our independent registered public accounting firm regarding our internal control over financial reporting. Our management's report on internal control over financial reporting was not subject to attestation by our independent registered public accounting firm pursuant to the rules and regulations of the Securities and Exchange Commission that permit us to provide only our management's report on internal control over financial reporting in this Annual Report on Form 10-K.

(Emphasis added)

93.    The 2014 10-K also reported that ERBA's net income for the year ended December 31, 2014 was $449,605. For the reasons set out in ¶155 below, the 2013 10-K overstated ERBA's 2013 net income. The total overstatement of net income in the period January 1, 2013 and June 30, 2015 is at least $3.0 million-$4.0 million.

94.    The 2014 10-K also included a certification from Defendant MHM that (1) ERBA's financial statements were presented in accordance with GAAP, and (2) MHM's audit comported with PCAOB Standards:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders
ERBA Diagnostics, Inc.

27

We have audited the accompanying consolidated balance sheets of ERBA Diagnostics, Inc. (a Delaware corporation) and its subsidiaries (collectively, the "Company") as of December 31, 2014 and 2013, and the related consolidated statements of income and comprehensive income, shareholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2014. The Company's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ERBA Diagnostics, Inc. and its subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each for the years in the two-year period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.***

/s/ Mayer Hoffman McCann P.C.

Boca Raton, Florida
May 15, 2015
(Emphasis added)

95.     MHM's statements were misleading for omitting to disclose that there was significant doubt about, indeed no reasonable basis to believe in, the accuracy of ERBA's financial statements: as MHM was aware that ERBA did not make contemporaneous financial entries, and there was therefore no reasonable assurance that its financial statements were accurate. Further,

28

MHM's statement that it conducted its audit in accordance with PCAOB Standards was misleading because in response to FE 1's claim that ERBA had created fraudulent accounting records, MHM was required to investigate, determine whether it could rely on management's representations, and report the finding to the audit committee – yet it did none of those things.

96.     On June 26, 2016, ERBA filed its 10-Q for the 3 months ended March 31, 2015 (the "Q1 2015 10-Q"). The Q1 2015 10-Q was signed by Defendant Gopalkrishnan.

97.     The Q1 2015 10-Q reported that ERBA's net income for Q1 2015 was ($1,018,967). For the reasons set out in ¶155 below, the 2013 10-K overstated ERBA's 2013 net income. The total overstatement of net income in the period January 1, 2013 and June 30, 2015 is at least $3.0 million-$4.0 million.

98.     On August 5, 2015, ERBA filed its 10-Q for the three months ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2915 10-Q was signed by Defendant Gopalkrishnan.

99.     The Q2 2015 10-Q reported that ERBA's net income for Q2 2015 was ($553,101). For the reasons set out in ¶155 below, the 2013 10-K overstated ERBA's 2013 net income. The total overstatement of net income in the period January 1, 2013 and June 30, 2015 is at least $3.0 million-$4.0 million.

**D.   Throughout the Class Period, ERBA was unable to pay its obligations as they come due, and thereby lost customers.**

100.     According to numerous well-placed insiders, throughout the Class Period, ERBA was plagued by lack of working capital, and routinely pushed off vendor payments, in violation of contractual terms. ERBA's disregard of its contractual obligations began to hurt its operations in 2014 as vendors cut it off, leaving it unable to manufacture its products. As a result, ERBA's customers left in droves, severely impacting ERBA's sales revenue and financial performance.

101.    ERBA's working capital problems also forced it to take numerous actions to reduce costs that injured its business. For example, ERBA laid off numerous well-paid staff, and then quickly discovered that these staff had been essential when the lay-offs hampered manufacturing. And ERBA collected – but did not pay – state and local taxes. ERBA thereby risked incurring penalties. Further, according to FE 2, many of its vendors stopped doing business with it for this reason.

102.    ERBA was unable to pay its vendors who, as a result, cut it off. Because it was unable to obtain raw materials and supplies, ERBA was, in turn, unable to produce the product its customers ordered. ERBA thus developed a huge backlog, and many of its items were placed on back order. Moreover, because ERBA was unable to supply certain of its testing kits, some of its customers were forced to have tests conducted by outside third parties. To retain the customers, ERBA was forced to reimburse the customers for their out-of-pocket expenses.

*2013*

103.    According to FE 1, ERBA maintained minimal balances in its business bank accounts – at most a few thousand dollars more than the checks that would be cashed immediately. Further, ERBA typically had nearly no cash on hand. To ensure that checks did not bounce, Defendant Gopalkrishnan instructed FE 1 to engage in check kiting by moving cash among bank accounts to cover payments just in time. ERBA did not keep accounting records of these transactions.

104.    According to FE 1, during her tenure of February 2013-September 2013, ERBA typically had accounts payable that were six months overdue. FE 1 raised the overdue accounts with Gopalkrishnan and asked whether she could pay them, but he repeatedly told her not to pay these accounts in favor of other more pressing transactions.

105.     Further, throughout her tenure, she received daily phone calls from vendors demanding to be paid. Whenever money came in to the company, it was immediately spent paying vendors' bills. Defendant Gopalkrishnan would personally decide which outstanding vendors' accounts to pay, favoring vendors with whom he dealt personally or vendors who were new to their company. All other vendors would have their bills pushed off. Most of ERBA's bills were overdue.

106.     During FE 1' tenure, a few vendors began to cut ERBA off.

**_2014_**

107.     In 2014, ERBA's non-payment and slow payment of vendor bills caused severe damage.

108.     Within weeks of being hired in June 2014, FE 2 first encountered major problems with ERBA's payments to vendors, its supply chain, and loss of sales. According to FE 2, ERBA's vendor problems were already a huge issue when he was hired. In fact, ERBA had customer back-orders dating back several years.

109.     The problems worsened during FE 2's tenure. ERBA's vendors cut it off, causing shortages of everything from cardboard boxes to raw materials, such as reagents and antibodies. Because of the shortages, ERBA was unable to complete manufacturing of certain of its products, and placed customer orders on back-order; and, as a result, it routinely lost major customers. According to FE 2, during his tenure, ERBA's non-payment of vendors caused a "spiraling loop":

> "It was a spiraling loop. We were losing customers because items needed to fulfill orders were on back order. We could not pay the vendors that had our items on back order because we did not have cash on-hand as we were losing our customers."

110.     FE 2 cited two examples of customers ERBA lost as a result during his tenure: Sunrise Medical Laboratories, a $200,000 a year account, lost in late 2014, and Laboratorio

Clinoco, a Puerto Rico $100,000 a year account. FE 2 estimates that ERBA lost millions of dollars of revenues because of the back order problem in late 2014 to early 2015. According to FE 2, it was impossible for FE 2 and his team to hit their sales targets because they were losing customers constantly because of the backorder problem. FE 4, who reported to FE 2, confirms FE 2's report that ERBA was losing customers because it was unable to manufacture products because angry unpaid vendors had cut it off.

111.    ERBA's cash flow problems forced it to use grossly inadequate suppliers. One of the products FE 3 sold was a chemical analyzer, the XL400. FE 3's client base consisted mostly of hospitals. Because ERBA had to stop using a previous supplier, however, ERBA was forced to make the XL400 with reagents that were not approved by the FDA, meaning that FE 3's clients could not even use the product he tried to sell them. According to FE 3, "[i]t was like selling a printer that had no ink, it was impossible."

112.    ERBA's non-payment and slow payment of its vendors irreparably damaged some of its most important business relationships. ERBA has entered into an agreement with Dynex Technologies to market and sell DSX and DS2 instrument systems alongside ERBA's tests designed to run on the DSX and DS2. DSX and DS2 are popular machines which run single-use diagnostic tests, including ERBA's. ERBA has been partnering with Dynex since 2008, and its partnership with Dynex was important enough that it was mentioned in each of ERBA's 10-Ks since 2008. Yet according to FE 3, in the second half of 2014, Dynex stopped supplying ERBA because ERBA didn't pay its bills. Dynex's cancellation of its arrangement had immediate consequences. Dynex's DSX and DS2 machines used a disposable tip with every test, which Dynex supplied. Because Dynex stopped supplying disposable tips, the DS2 and DSX became

inoperable for ERBA's customers. As a result, ERBA's customers stopped buying tests designed to run on Dynex's DS2 and DSX machines.

113.    Indeed, in 2014, ERBA had to take dramatic steps to pacify its customers. ERBA's customers were primarily laboratories that did their own testing. By 2014, ERBA had no product to sell them. To fulfil their contractual obligations, ERBA's customers were forced to contract with third-party laboratories who had the necessary equipment to run ERBA's competitors' tests. ERBA's customers thereby incurred significant out-of-pocket expenses.

114.    To prevent customers from jumping ship, in July and August 2014, ERBA told its salespeople to tell customers that ERBA would reimburse them for the additional expenses they thereby incurred (the "reimbursement program"). FE 3 estimated that ERBA's total loss from his customers alone was $250,000-$300,000 for the end of 2014. FE 2 told FE 3 all of ERBA's salespersons were in the "same boat" in terms of financial losses, suggesting total company-wide losses of about $1.5 million as a result of the reimbursement program. ERBA did not disclose this customer reimbursement program in its SEC filings.

115.    ERBA's cash flow problems also made it miss payments to employees. For example, FE 3 reports that in his almost one and a half years at the company, he only received one commission check. Moreover, because of the customer reimbursement program, FE 3 would actually have negative net sales in Q1 2015. Both because he did not receive commission checks and because it became impossible for him to make sales, FE 3 left ERBA.

116.    ERBA went to extreme lengths to retain cash to pay its bills. For example, according to FE 2, ERBA would collect state and federal sales tax, but was delinquent in paying the taxes to state and federal governments. ERBA thereby potentially incurred penalties.

According to FE 2, some vendors who discovered ERBA's delinquent payments then refused to work with ERBA because of this delinquency.

117.    ERBA also was forced to conduct mass layoffs as a result of its undisclosed cash shortage, which dramatically hurt it. FE 5 recalls a meeting taking place in Diamedix's offices in November 2013, attended by Defendants Clark, Suri, and Vazirani, Ann Bolton, Escalon's VP of manufacturing, Duane Poorman, Diamedix's General Manager, and a few other Diamedix executives. At the meeting, someone produced a Diamedix employee list, listing only ages and salaries. Executives started scratching people off the list to indicate those who would be laid off. There was no basis to fire these employees, who were very capable at their jobs, other than age and salary. Indeed, ERBA's desperate cost-cutting quickly worsened its condition. In February 2014, FE 3 attended a sales meeting led by Gopalkrishnan, when the issue of customer attrition arose. At the meeting, Gopalkrishnan admitted that ERBA had "mistakenly let key people go [at Diamedix] and production had come to a halt."

118.    ERBA officers were kept abreast of vendor problems. For example, FE 4 would contact Defendant Gopalkrishnan regularly to ask Gopalkrishnan about backordered items, and to explain that FE 4 could not deliver customer orders. Gopalkrishnan's responses to FE 4 showed he was completely aware of the problem.

119.    In July 2014, at a meeting also attended by Gopalkrishan and Gopalkrishnan's son, Vazirani asked FE 2 to explain why ERBA's sales were decreasing. FE 2 organized a team of his six top sales employees to determine why ERBA's backorders were so large and harming sales. Through July and August, the study determined that ERBA's customers had been repeatedly emailing it to complain about the significant backorders. In January 2015, FE 2 presented full findings at a management meeting attended by at Gopalkrishnan and Patel, among others. FE 2

explained all of the material issues attributable to ERBA's not timely paying vendors and having those vendors cut off business. FE 2 warned Gopalkrishnan that unless these issues were addressed, ERBA could expect to lose an additional $1 million in sales in 2015.

120.    ERBA's financing problems were made worse by Transasia's interference. One of ERBA's top customers was a large Russian company, Analitica, which bought medical instruments and reagents that were created and manufactured out of the US side of ERBA. Analitica accounted for annual sales of $1-2 million, or about 10% of ERBA's total sales. By early 2015, Analitica had $2 million in orders with ERBA that were backordered because ERBA had failed to pay its vendors. ERBA sales personnel, including FE 2, developed and maintained the Russian company as a customer. ERBA shipped product every month directly to the Russian customer. Sales to the Russian customer were recorded on ERBA's books as outgoing product.

121.    Instead of having ERBA sell its product to these major clients, however, Transasia bought ERBA products at a low fixed price. ERBA personnel, including Defendant Gopalkrishnan, held weekly meetings to determine how low they could price the product for Transasia. The Russian customer then paid Transasia, rather than ERBA. The transactions were thus related-party transactions, which were not properly disclosed.[7]

122.    According to FE 2, the cash from the Russian customer would have been sufficient to satisfy much of ERBA's obligations.

123.    Similarly, Transasia uses ERBA as a piggybank to pay its corporate expenses. According to FE 5, Transasia purchased chemistry reagents from Pointe Scientific. Transasia used

---

[7] SEC rules required disclosure of all related-party transactions (including transactions with Transasia), along with all other material information concerning the transaction. 17 C.F.R. § 229.404(a). Yet instead of presenting each related party transaction, ERBA at most set out the total dollar amount of transactions with Transasia in any given year. ERBA thereby avoided disclosing the transactions' lopsided terms.

the reagents in its own products. But Transasia inserted JAS as a middleman by putting the orders in under JAS's name and having ERBA pay for it. While Transasia was supposed to repay JAS for its costs, during FE 5's tenure, it never did. The purchases, which amounted to several million dollars per year, severely strained ERBA's cash flows. FE 5 maintains that Transasia made purchases through JAS because Transasia "tried to keep as much money as it could in the [non-ERBA] portion of the company." This related-party transaction was not properly disclosed.

124.    According to FE 5, who learned of this from conversations with Defendant Clark, a personal friend, at Transasia's direction, Diamedix began manufacturing products for a large order for one of Transasia's customers. Transasia did not make any upfront payments. But Transasia's order fell through and it never purchased the inventory from Diamedix. Diamedix was left with unsellable inventory. Through this and other shenanigans, ERBA's inventories increased from $3.8 million as of December 31, 2011 to $8.4 million as of June 30, 2015, net of adjustments for depreciation, further exacerbating ERBA's cash shortage. This related-party transaction was not properly disclosed.

125.    Drew Scientific held various patents involving the A1C Assays and procedures for testing A1C Assays. According to FE 5, shortly after ERBA acquired Drew Scientific, the two companies jointly entered into an agreement with ERBA (France) through which ERBA (France) would pay an ongoing fee for Drew Scientific's intellectual property and technical information and would undertake manufacturing Drew Scientific's products. Drew Scientific supplied intellectual property and technical information to ERBA (France), but shortly thereafter, ERBA (France) cancelled the agreement, and stopped paying a fee to Drew Scientific. Notwithstanding the cancellation, however, Transasia currently manufactures Drew Scientific's product in India, and does not pay any profits or royalties to Drew Scientific or ERBA. FE 5 participated in weekly

telephone status calls regarding this contract with Suri, Gopalkrishnan, and officials from ERBA (France). Notably, the agreement was never disclosed in ERBA's SEC filings; nor did ERBA disclose that there were any related-party transactions between Drew Scientific and ERBA (France).

### E.  ERBA asks its accountants to falsify accounting records.

126.    Throughout the Class Period, ERBA's financial records were in disarray because ERBA did not keep accurate contemporaneous records of its transactions. Accordingly, ERBA was forced to reconstruct transactions and their basis months or years later, and backdate accounting entries. Because of the high risk of misstatement, the ERBA accountant who was responsible for keeping its books refused to sign off on its financial statements. ERBA filed them anyway. ERBA's accounting problems were most acute in intercompany transactions, of which there were many.

127.    FE 1, a licensed CPA, was hired by Defendant Rodriguez.

128.    As FE 1 began working for ERBA, she was amazed to discover that ERBA had no accounting system for its business. For that reason, ERBA had hired FE 1, who was tasked with creating accounting journals to reflect what the company had done in 2012 and 2013 by reconstructing those journals from bank statements of ERBA and its subsidiaries. The financial records constructed by FE 1, in turn, were used to create financial statements. It was necessary to hire FE 1 because, she reports, ERBA was unable to produce accurate financial statements, and did not develop such an ability by the end of FE 1's tenure.

129.    FE 1 had not personally ordered or processed the transactions she was asked to report in ERBA's records. Indeed, FE 1 did not even work for ERBA at the time it engaged in these transactions. Thus, FE 1 describes her work at ERBA as that of a "forensic account[ant]",

referring to the subset of the accounting profession which recreates financial records to investigate fraud and the like.

130.    ERBA's accounting was complex. ERBA handled even routine matters through intercompany transaction. For example, according to FE 1, except for payments to the Board of Directors and ERBA's stockholders, all of ERBA's subsidiaries payments (including all payroll and vendor payments) were made through Diamedix; ERBA's subsidiaries were supposed to eventually repay Diamedix. ERBA had no rules about recording either Diamedix's payments, or other subsidiaries' reimbursements to Diamedix, onto its financial records. Sometimes accounting staff recorded intercompany transactions twice, and sometimes they did not record the intercompany transactions at all. Even if accounting staff properly recorded the transactions, they rarely recorded the purpose of the transaction – i.e., that it was reimbursement for expenses.

131.    In fact, according to FE 1, the problems ERBA suffered in trying to account for simple payments to vendors and payroll were not isolated incidents. ERBA's financial department as a whole had no structure and no formal policies governing how to record financial information. As a consequence, all of ERBA's accounting (especially with respect to intercompany transactions) was chaotic and wholly unreliable.

132.    It was FE 1's job to sort through ERBA's bank accounts to create accounting journals. Moreover, according to FE 1, ERBA's accounts rarely balanced. Thus, to reconcile the accounts, Rodriguez asked FE 1 on a daily basis to enter information into its accounting journals with no back-up documentation. The transactions Rodriguez asked FE 1 to input caused ERBA's financial statements to appear to balance, but not to be accurate.

133.    When FE 1 explained to Rodriguez that ERBA would use the accounting journals to generate financial statements, FE 1 repeatedly told Rodriguez and ERBA's auditors that she did

not have the necessary information to generate accounting journals. ERBA asked FE 1 to sign off on the accounting journals. But FE 1 refused because she believed correctly that it was unethical for an accountant to sign-off on journal records that had been falsified. Instead, Rodriguez, and not FE 1, signed off on the accounting journals – even though FE 1, and not Rodriguez, had generated them. According to FE 1, MHM was aware of these facts at the time of each annual audit. FE 1 has knowledge of what MHM knew, because she interacted with MHM every day. Further, FE 1 specifically told ERBA and ERBA's auditors that the accounting journals she generated were not accurate and truthful.

134.    Moreover, though ERBA filed its 2012 financial statements in June 2013, the audit of ERBA's 2012 financial statements continued even thereafter. The audit was not finished by the time FE 1 left in September 2013. During the course of the audit, ERBA's auditors regularly voiced concerns (including to FE 1) that accounts could not be reconciled.

135.    FE 1's responsibilities included monitoring ERBA's bank accounts and those of all of its subsidiaries. She directly communicated with Defendant Gopalkrishnan on a daily basis. Defendant Gopalkrishnan asked FE 1 to draft a daily email to him summarizing ERBA's balances and available funds from all of its own and its subsidiaries' bank accounts.

136.    FE 1 reports that she used these emails to inform Gopalkrishnan that ERBA's financial records were in disarray. FE 1 specifically noted that ERBA used improper and irregular accounting. Yet Gopalkrishnan told FE 1 the improper accounting "didn't concern" her. FE 1 adds that "[h]e knew what was going on." FE 1's emails also alerted Defendant Gopalkrishnan to ERBA's problems paying vendors.

137.    FE 1 frequently reported to both Clark and Gopalkrishnan on accounting issues. Further, FE 1 had frequent conversations with Gopalkrishnan and Patel describing her concern that ERBA was completely non-compliant with GAAP.

138.    Gopalkrishnan ultimately fired FE 1 for refusing to produce fraudulent accounting records.

### F.   MHM violated PCAOB Standards by failing to investigate FE 1's report that the accounting records she herself generated were not truthful

139.    An auditor's finding that a client may have lied to it or to another auditor is the single most alarming red flag an auditor can ever discover. The discovery imposes several obligations on the auditor.

140.    *First*, the auditor must investigate the circumstances and consider the reliability of the specific representations management made. AU §333.04.

141.    *Second*, the auditor must determine whether it can continue to rely on management's representations on any matter. *Id.*; *see also* AU §317.16 (same). At all times, the auditor must maintain the professional skepticism a prudent auditor would express.

142.    *Third*, the auditor must determine whether to report the false statement to the SEC. The SEC's rules are incorporated by reference into PCAOB Standards. AU § 150 note 1. This includes the SEC's rules on reporting illegal acts. AU § 317 n.3, n.4. The SEC's rules prohibit "officer[s]" of public companies from "mak[ing] or caus[ing] to be made a materially false or misleading statement to an accountant in connection with [] any audit." 17 C.F.R. § 240.13b2 2(a)(1). Penalties include a fine of not more than $5,000,000 and imprisonment of not more than 20 years. 15 U.S.C. §78ff(a).

143.    If the auditor determines that an illegal act was committed, it must, among other things, inform the company's audit committee. 15 U.S.C. § 78j-1(b)(1)(B). The auditor must then

determine whether the audit committee has taken appropriate remedial action and, if not, inform the SEC.

144.    If the auditor is precluded from obtaining sufficient evidential matter to determine whether an illegal act has occurred, the auditor must disclaim an opinion on the financial statements. AU § 317.19. If the client refuses to accept a report disclaiming the auditor's opinion, the auditor must noisily resign. AU § 317.20.

145.    Hence, upon being told that ERBA had provided falsified accounting records, MHM was required to (a) investigate the reliability of the falsified accounting records; (b) determine whether it could continue to rely on management; and (c) determine whether it needed to report the fraud to the audit committee and, ultimately, the SEC.

**G.    Defendants' false statements caused investors' losses.**

146.    ERBA's undisclosed working capital problems caused its revenues to decline sharply beginning in late 2014. As ERBA's fortunes inexplicably took a sharp turn for the worse, investors suffered significant losses.

147.    On November 10, 2014, before the start of trading, ERBA announced its results for Q3 2014. ERBA's revenues of $6.5 million were down almost $0.5 million from Q3 2013, and fell almost $1.4 million below analyst expectations. Further, ERBA's earnings were $0.00/share, falling below analyst expectations of $0.01/share.

148.    In fact, the true undisclosed cause of the poor performance was that the vendor problem set out in ¶¶100-125 above – ERBA being cut off by suppliers and thereby losing customers – was wreaking havoc on ERBA's revenues. ¶110. Thus, ERBA's poor results were the materialization of the risk concealed by its statements that it had adequate working capital. Further,

as set out above in ¶114, ERBA had already begun to incur losses from its customer reimbursement program.

149.    On November 10, 2014, ERBA's stock price fell from its previous closing price of $3.12/share to close at $2.74/share, down $0.38/share, or 12.2%, on heavy trading volume, damaging investors.

150.    On April 1, 2015, ERBA filed a Form 12b-25 announcing that it would not be able to file its 2014 10-K before the March 31 deadline, claiming it would file by April 15 instead. On April 16, ERBA announced that it would further delay filing until April 30. Then, on April 21, after close of trading, ERBA announced that it had received a letter from the NYSE stating that ERBA's failure to timely file the 2014 10-K was a material violation of its listing agreement and that the NYSE was authorized to suspend and eventually remove ERBA's stock from trading. The NYSE's delisting letter was a materialization of the risk that because of ERBA's poor accounting records, it would not be able to timely prepare and file its SEC filings.

151.    On April 22, 2015, ERBA's stock price fell from its previous closing price of $3.34/share to close at $3.04/share, down $0.30/share, or 9.0%. It continued to fall the next day to $2.82/share, or $0.22/share, for a total loss of 15.5%. On both days, there was heavy trading volume.

152.    On May 15, 2015, after close of trading, ERBA announced its results for Q4 and FY 2014. ERBA's results were dismal. Q4 2014 revenues were $6.0 million, down almost $1.7 million from the previous year's total of $7.7 million. Moreover, ERBA's Q4 2014 net loss was about $295,000, against a net profit of about $706,000 in Q4 2013.

153.    Again, the true undisclosed causes of poor revenues and net income were the vendor problem and customer reimbursement program.

42

154.   On May 18, 2015, the next trading day, ERBA's stock price fell from its previous closing price of $3.05/share to close at $2.71/share, down $0.34/share, or 11.1%, damaging investors.

155.   On June 26, 2015, ERBA announced its results for Q1 2015. ERBA's condition had dramatically worsened. Q1 2015 revenues were a mere $4.9 million, down almost 25% from the previous year's total of $6.4 million. And in Q1 2015, ERBA recorded a net loss of about $1,019,000 – against a net profit of $164,000 in Q1 2015. ERBA attributed its poor results in part to "a significant volume of backorders to work through".

156.   On June 29, 2015, the next trading day, ERBA's stock price fell from its previous closing price of $2.90/share to close at $2.18/share, down $0.72/share, or 24.8%, on extremely heavy trading volume, damaging investors.

157.   After close of trading on November 20, 2015, ERBA filed a Form 8-K with the SEC, stating that several of the previously issued financial statements could no longer be relied upon and that ERBA had deficient internal controls. The November 20, 2015 Form 8-K states in relevant parts:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a)   On November 20, 2015, the Audit Committee of the Board of Directors of ERBA Diagnostics, Inc. (the "Company"), after discussion with the Company's management team, *concluded that the Company's financial statements for each of the years ended December 31, 2014 and 2013 and for each of the interim periods ended March 31, 2015 and June 30, 2015 (collectively, the "Non-Reliance Periods") should no longer be relied upon. Further, the Company's disclosures related to such financial statements, such as those included in the Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, earnings press releases, earnings conference calls and similar prior communications issued by or on behalf of the Company, with respect to the Non-Reliance Periods should also no longer be relied upon.* The Company intends to restate its financial statements for the Non-Reliance Periods by filing amendments to its Annual Report on Form 10-K for the year ended December 31, 2014, which

will also include details regarding adjustments in the portion of the Non-Reliance Period occurring during the year ended December 31, 2013, and its Quarterly Reports for the periods ended March 31, 2015 and June 30, 2015 (collectively, the "Restated Filings") as soon as practicable.

In addition, as the Company had previously reported, the Company has delayed the filing of its Quarterly Report on Form 10-Q for the interim period ended September 30, 2015. The Company expects to file its Quarterly Report on Form 10-Q for the interim period ended September 30, 2015 on or about the same time it files the Restated Filings.

**Background**

As the Company had previously reported, the Company's management had evaluated the effectiveness of the Company's internal control over financial reporting and, based upon those evaluations, ***the Company's management had concluded that the Company's internal control over financial reporting was not effective, because there was a material weakness in the Company's internal control over financial reporting as a result of the Company's inadequate staffing of its financial accounting office, which had resulted in, among other things, at times the Company being unable to provide timely account reconciliations***. As the Company had also previously reported, the Company's remediation efforts to address this material weakness have been on-going and include, among other things, hiring additional qualified finance personnel and evaluating and undertaking certain improvements to the Company's systems and processes, which, if successful, the Company believes will be sufficient to provide it with the ability to remediate or cure such material weakness in the future. As the Company had also previously reported, in connection with the Company's efforts to improve the effectiveness of its internal control over financial reporting, ERBA Diagnostics has undertaken a review of the intercompany transactions among its subsidiaries and the resulting eliminations made, or required to be made, in the process of producing its consolidated financial statements and their potential impact on reported assets and liabilities.

During the third quarter of 2015, the Company implemented, among other things, a new, enhanced balance sheet review process, with a particular focus on reconciliation of significant accounts, including, among others, intercompany accounts and corresponding eliminations made, or required to be made, at the consolidated level, and their potential impact on its consolidated financial statements. In the course of implementing such new, enhanced review process and reviewing such transactions among its subsidiaries and the resulting eliminations made, or required to be made, in the process of producing its consolidated financial statements as discussed above, the Company identified materially out of balance accounts evident in the elimination process and noted erroneous recording of transactions to such intercompany and other accounts throughout the Non-Reliance Periods. The Company's review of these matters is on-going.

**Expected Impact of Restatements**

*Preliminary indications from the Company's review are that the necessary adjustments to the Company's financial statements during the Non-Reliance Periods are expected to result in an aggregate decrease in net income (or increase in net loss) in the approximate range of $3.0 - $4.0 million,* as well as in a shift of certain previously recorded income and expense items to the appropriate periods throughout the Non-Reliance Periods. *The Company expects these adjustments to materially impact cost of goods sold, general and administrative expense and various off-setting balance sheet accounts.* The Company has not yet completed its final determination and review of the matters discussed above and, therefore, the amounts described above and the periods to which they relate are preliminary, unaudited estimates that are subject to change. There can be no assurance that the final amounts and adjustments will not differ materially from the estimated amounts described above, or that additional adjustments will not be identified, the impact of which may be material.

The Audit Committee has discussed the matters set forth in this Current Report on Form 8-K with its independent registered public accounting firm – Mayer Hoffman McCann P.C.

(Emphasis added).

158.    On November 23, 2015, the next trading day, ERBA's stock price fell from its previous closing price of $1.74/share to close at $1.44/share, down $0.30/share, or 17.2%, on extremely heavy trading volume, damaging investors.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

159.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ERBA securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein and ERBA (France); the officers and directors of the Company, ERBA (Germany), ERBA (France), and Transasia, at all relevant times, and members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

160.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ERBA securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified through appropriate discovery or identified from records maintained by ERBA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

161.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

162.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

163.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ERBA;

      c.  whether the Individual Defendants and Controlling Corporate Defendants caused

ERBA to issue false and misleading financial statements during the Class Period;

d.  whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

e.   whether the prices of ERBA's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

164.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

165.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  As a regulated issuer, ERBA filed periodic public reports with the SEC. ERBA met the requirements for listing, and was actively traded on the NYSE, under ticker ERB;

b.  On average, 291,000 shares of ERBA stock were traded on a weekly basis during the Class Period. During the Class Period, there were approximately 7.1 million free-trading shares which were not owned by insiders. Thus, about 4.1% of all ERBA shares that were not owned by insiders traded every week, permitting a very strong presumption of efficiency;

c.  ERBA regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

 d. ERBA was followed by at least six analysts who issued reports about it;

 e. New company-specific information was rapidly reflected in the Company's stock price; and

 f. ERBA had a designated market maker, which created a broad and liquid market in its stock.

 166. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

 167. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>**COUNT I**</u>

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
<u>**(Against the Individual Defendants, ERBA, and MHM)**</u>

 168. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

 169. This Count is asserted against ERBA, MHM, and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

170.     During the Class Period, ERBA, MHM, and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

171.     ERBA, MHM, and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ERBA common stock during the Class Period.

172.     ERBA, MHM, and the Individual Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of ERBA, MHM, or the Individual Defendants, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of ERBA, their control over, and/or receipt and/or modification of ERBA's and MHM's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning ERBA, participated in the fraudulent scheme alleged herein.

173.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ERBA personnel to members of the investing public, including Plaintiff and the Class.

174.    As a result of the foregoing, the market price of ERBA common stock was artificially inflated during the Class Period. In ignorance of the falsity of ERBA's, MHM's, and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ERBA securities during the Class Period in purchasing ERBA common stock at prices that were artificially inflated as a result of ERBA's and the Individual Defendants' false and misleading statements.

175.    Had Plaintiff and the other members of the Class been aware that the market price of ERBA common stock had been artificially and falsely inflated by ERBA's, MHM's, and the Individual Defendants' misleading statements and by the material adverse information which ERBA, MHM, and the Individual Defendants did not disclose, they would not have purchased ERBA common stock at the artificially inflated prices that they did, or at all.

176.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

177.    By reason of the foregoing, ERBA, MHM, and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ERBA common stock during the Class Period.

178.    This action was brought within five years of Defendants' last wrongful act and two years of discovery of the fraud.

## COUNT II

**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants and the Corporate Controlling Defendants)**

179.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180.    During the Class Period, the Individual Defendants and the Corporate Controlling Defendants participated in the operation and management of ERBA, and conducted and participated, directly and indirectly, in the conduct of ERBA's business affairs. Because of their senior positions and/or controlling share ownership, they knew the adverse non-public information about ERBA's misstatement of revenue and profit and false financial statements.

181.    As officers, directors, and/or controlling shareholder of a publicly owned company, the Individual Defendants and the Corporate Controlling Defendants had a duty to disseminate accurate and truthful information with respect to ERBA's financial condition and results of operations, and to correct promptly any public statements issued by ERBA which had become materially false or misleading.

182.    Because of their positions of control and authority as senior officers and/or controlling shareholders, the Individual Defendants and the Corporate Controlling Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ERBA disseminated in the marketplace during the Class Period concerning ERBA's results of operations. Throughout the Class Period, the Individual Defendants and the Corporate Controlling Defendants exercised their power and authority to cause ERBA to engage in the wrongful acts complained of herein. The Individual Defendants and Controlling Corporate

51

Defendants, therefore, were "controlling persons" of ERBA within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ERBA common stock.

183.    By reason of the above conduct, the Individual Defendants and the Corporate Controlling Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ERBA.

184.    This action was brought within five years of Defendants' last wrongful act and two years of discovery of the fraud.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 10, 2016                    Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        By: /s/ Laurence Rosen
                                        Laurence Rosen, Esq.
                                        Fla. Bar No. 0182877
                                        275 Madison Avenue, 34th Floor
                                        New York, NY  10116
                                        Phone: (212) 686-1060
                                        Fax: (212) 202-3827
                                        Email: lrosen@rosenlegal.com


                                        Michael Goldberg, Esq.
                                        **GOLDBERG LAW PC**
                                        13650 Marina Pointe Dr. Suite 1404
                                        Marina Del Rey, CA 90292
                                        Phone: 1800-977-7401
                                        Fax: 1800-536-0065

                                        Lead Plaintiffs' Co-Lead Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2016, I filed the foregoing document with the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

Dated: June 10, 2016                                    /s/ Laurence M. Rosen